By the Court

Lumpkin, C. J.,
delivering the opinion.
I have carefully reviewed the voluminous documents connected with this case, and find nothing to raise a doubt as to the correctness of the conclusion to which the Court came in its decision, affirming the judgment of the Circuit Judge. No case has been produced, we presume none can be found, in which a judgment of a Supreme Court had been reversed in an Inferior Court upon the grouhd of accident and mistake. Establish such a precedent, and the circle of litigation is complete, the end of it unattainable. Notwithstanding our Constitution has labored to bring about a contrary result, scores of cases which have been brought up to this Court, which have gone off on similar accidents, mistakes or misapprehensions of law, or fact, or both, might be renewed. This is probably a hard case on *21 Mr. Bryan, but what is the ground of surprise upon which he seeks relief? — that his counsel mistook the term of the Supreme Court to which his bill of exceptions was returnable, and that they were led into the error by relying on a newspaper calendar instead of the published statute of the State for information, a source of information, as is well known to the profession, notoriously inaccurate. In Rogers vs. Kingsbury, 22 Georgia Reports, 60, a motion to dismiss an appeal was granted by the Superior Court and the appellant excepted. A bill of exceptions was made out, but, owing to a mistake of the clerk, the papers were not transmitted in proper time to this Court, and the judgment of confession ivas affirmed. A bill was filed praying for a new trial and an injunction. The Chancellor refused, and an appeal was again taken to this Court. Judge Benning delivered the opinion. “A writ of error,” he said, “ would have furnished a corrective for the errors complained of in the bill, but the benefit of the writ of error was lost to the complainant by his own negligence. We must impute it to his owii negligence that he did not get a mandamus, and, therefore, we must impute it to his negligence that he missed having his case heard in this Court. Now, a Court of equity will not relieve a party from a judgment which he might have prevented but for his own negligence.” And this is only one of a numerous class of cases standing in the same category. In some, the party supposed he had obtained an acknowledgment of service, but it proved to be otherwise. In all, some misapprehension or mistake as to duty.
We commend the zeal of counsel in their clients’ cases. But what are we called on to do in this record ? To review our own decisions “ upon grave questions of law ” decided by this Court between these same parties in 1853, eleven years ago, in 16 Georgia Reports, 185; and again reaffirmed in 1856, 20 Georgia Reports, 480, to-wit: the escheat question, and the construction of the Acts of 1818 and 1819. Never were questions more elaborately argued or more generally considered, as the Reports will show. Eor one, I must be excused from such a Sisyphean labor. And as to the abstract justice of this case, I can truly say that, after examining the evidence carefully, *22 and for the third time for the last ten years, there never was a fairer case for doubt on the main point involved, to-wit: the status of Joseph Nunez. "Was he a free white man, or a free person of color? Let in the evidence of file from Chatham county of the will of old man Nunez, and there is moral, if not legal, certainty upon the point, and notwithstanding the ridicule attempted to be cast upon this document, as that, although it purports to be dated in 1785, and as adjudicated by the “Honorable Henry Osborne, Esquire, Chief Justice, the Honorable Joseph Clay, Samuel Elbert and Richard Wylly, Esquires, Assistant Justices,” yet counsel suggests that “it may be a fiction, a forgery of quite modern date.” “The files whence it was taken are subject to constant change, alteration, addition, subtraction, unperceived by any custodian,” and counsel “concluded, if anything that a grave Judge might do could possibly look ludicrous, the admission of this document, and the reason for it, would strike my eye in that point of view.”
I submit that there is one thing, at least, more ludicrous than the ruling of his Honor, and that is the foregoing supposition of learned counsel. Hid Hugh Walton or his counsel introduce by stealth this document amongst the files of. the Ordinary in Chatham county ? I doubt whether there be two men in the State that know that Henry Osborne was Chief Justice of Georgia in 1787, and that Joseph Clay, Samuel Elbert and Richard Wylly were his associates. Sir Walter Scott has acquired no little celebrity as a writer of fiction, but the forger of the imaginary will of the imaginary Moses Nunez has thrown the author of the Waverly Novels far into the background. No more genuine document ever came from the pigeon-holes of a clerk's office than this paper, purporting to be the last will and testament of Moses Nunez, “gentleman,” as he is therein styled, and the decision of the Court upon it, delivered by the Judges seriatim, smacked smartly, too, of Westminster Hall, although it may not quite equal in ability the decree of Sir Thomas Moore, Chancellor of England, as to the disputed ownership of a dog, claimed by his own lady and a market woman, (which, strange to tell, is the only monument *23 of his judicial wisdom that has been preserved to us,) or the decision of Solomon as to the maternity of the child. Assuming, then, this document to be genuine, what inferences are to be made from its contents ? What was Moses None# ? Probably a Portuguese, as his name imports, from a left hand marriage with a mulatto by the name of Rose; that from this connection sprang James Nunez, Alexander Nunez, and Fannie Nunez, who afterwards intermarried with George Galphin; that James, oneof the offspring, emigrated to athen distantpartof the country, that he acquired some notoriety at dances for the grace and agility with which “he tripped the light fantastic toe;” that James Nunez intermarried with a very pretty white woman, that by reason of this intermixture with the white race, Joseph Nunez was lighter than his father, whose mother, in the words of one of the witnesses, was a woolly-headed mulatto. From this simple, and, I doubt not, truthful genealogy, you have the solution of this much mooted matter as to the origin and blood of this mongrel family. Some of the witnesses testified that it was constituted of white, Indians and negroes — others, that they were white, Indian, negro, Portuguese and Spanish; whereas, the Portuguese and mulatto, viz: white and negro, accounts for the whole difficulty. This early record, then, sheds a flood of light upon these various conjectures as to the blood of this family. Says the counsel for plaintiffs in error, in commenting on the pliancy with which Joseph Nunez yielded himself to the guardianship of McNowell and Urquhart, “ We call Joseph Nunez idiotic from the conduct of his whole life. Although all the testimony shows that his father was a man of property, refinement and education, and left a considerable property to Joseph, yet he never learned to write his own name, and took up with negroes as his associates, instead of maintaining in society the position of his father and mother, marrying one of his own slaves for his wife and having a family by her. Could not such a dunce be made to believe it was necessary for him to have a guardian ?” I ask, why was he suffered thus to grow up in ignorance? Who was charged with his early training? I answer, James Nunez, his father — this man of property, refinement and education, but who seems, after all, to have prided *24 himself much more upon the accomplishment of his feet than his head. No; the father had eaten sour grapes, and the children's teeth were on edge. The old Portuguese ancestor took “mulatto Ro.^” for his concubine, acknowledged her as such in his will, (feeling no degradation by the fact,) in which he styles himself “ gentleman,” and renders thanks to the mercy and goodness of God “in preserving to him asound mind and memory by which he is enabled to give freedom to mulatto Rose and their mutual offspring, James, Robert and-Alexander Nunez, and their daughter, Fannie Nunez — a full and perfect freedom from all slavery and servitude, and, also, negroes and other property, as a reward and acknowledgment of the faithful conduct and behavior of the said mulatto Rose toward him and his children.”
Is it strange that persons should have mistaken the blood of James and Joseph Nunez? It is done daily in our midst. A mistress and her maid recently received Episcopal confirmation together, kneeling side by side at the same altar, boarding at the same hotel, where the latter was received and treated as a white woman by the inn-keeper and his female guests, when the latter turned out to be a mulatto, and was promptly hurled from her position of social equality. A man, at the beginning of this war, dropped into a village of one of our counties in Middle Georgia, and becoming rather famous for his pugilism, he was chosen an officer in one of the volunteer companies enlisting for the military service. His status was never questioned, until, accosted rather familiarly by his felloto-servant, who had known him long and intimately, an investigation was had, and Sambo was returned to his owner. Which of us has not narrowly escaped petting one of the pretty little mulattoes belonging to our neighbors as one of the family? But I forbear further remarks, and come to the gravamen of the bill for a new trial in the action of trover.
The substance of the ground is, that since the trial of the above action of trover, Mr. Bryan has been informed and believes that the records of Burke Superior Court will show that the status of Joseph Nunez as a free white citizen was established by the judgment of the Superior Court; that said records have been destroyed by fire, and that he hopes and expects to *25 be able to supply them upon sufficient testimony, so as to procure and produce in evidence record proof of said important fact, aud the plaintiff in error attaches to his bill as exhibits the depositions of James F. Dailey, E. J. Carter and Eamsome Lewis in support of this ground. The Court could do no better than adopt the criticism of Colonel Pringle, counsel for the defendant in error, upon this testimony. Dailey swears that he knew Joseph Nunez while in life, and to the best of his recollection and belief, he was tried in Burke county upon thesiaiws of his citizenship, and it was then and there determined by the Court that he was a free white citizen. The testimony, so far as he recollects, was that he was a Portuguese, and not a free negro. There are some circumstances that occurred on that day that make it more plain to my mind, perhaps, than it would otherwise have been, etc. He has to rely upon his recollection, as the records of the county of Burke are destroyed, etc. In this deposition there is nothing certain. The witness testified from the best of his recollection, and as far as he recollects, etc., and says there were some circumstances that occurred on that day that make it more plain, etc. But what these circumstances are that made it more plain, the witness has not deigned to tell. Indeed, the whole tenor of his affidavit shows the witness to have been in doubt, and yet struggling between his doubts and his duty on the one hand, so as to avoid the crime of false swearing, and his ardent desire to accommodate his friend and neighbor, Mr. Bryan, on the other. He seems to strain a point and state that he (himself) was tried on his status of citizenship, to the best of his (witness’) recollection and belief. Carter swears, to the best of his recollection there was a judicial investigation in reference to the status of citizenship of Joseph Nunez, and it is his impression he was pronounced not a free person of color, but a Portuguese, etc.
Here is more doubt and uncertainty than in the other affidavit. He only remembers, to the best of his recollection, a judicial investigation in reference to his status, etc., and then states his impression of the result. Lewis goes one step further in his affidavit; he says, to the best of his knowledge and recollection, (not belief,) that Nunez was tried in the Superior Court of *26 Burke county upon his status, and it was then and there determined that he was a free white citizen, and not a free negro; the record being burnt, he liad to rely upon memory;.and he further saith, that he was there and heard a part of the testimony-given in upon said trial. I say Lewis’ deposition goes one step further, because he states that it was in the Superior Court that the trial was had; but, like the others, he speaks of but a single trial or investigation, as if only one trial was had, nor do either of the witnesses specify with proper precision the nature of the issue, nor the time at which it was tried, and the Court is left to conjecture whether it was the direct issue on the status of Joseph Nunez, as provided by statute of 1840, (see Cobb N. D., 530,) or some other issue in which the status of said Nunez became a question. Nothing but a direct issue on said status could operate as an estoppel. The statute above alluded to requires “ two concurring verdicts, as in case of divorce.” Which of these verdicts do the witnesses allude to ? If the first, the depositions do not go far enough. If the last, the fact would have become so notorious that the complainant would have little or no difficulty in establishing it by the positive testimony of some one who sat upon the trial, or by some other person who was present, either a resident lawyer or the Judge, or some other member of the bar. But there is abundant proof in the record here that no such state of facts ever existed. This statute in Cobb’s New Digest, page 530, was passed in 1840, and the exhibit to complainant’s bill shows that it was proven in the trover trial by the records of Burke Inferior Court that the intestate of defendant in error (Nunez) had applied both in 1841 and 1843 to have a guardian appointed, and in the judgment of said Court, which is a Court of record in both applications, Nunez is called “a free person of color:” See printed exhibit, page 26. Again, by page 12 of said exhibit, it will be seen that the complainant had searched the records of Burlce Superior Court, for he has there introduced the interrogatories of the clerk, together with the' copy interrogatories of one Joseph Bush, in order to impeach his (the said Bush’s) testimony in the trover trial in Houston. In these copy interrogatories, Bush, in speaking of James Nunez, the father of Joseph Nunez, says, “he was an American; his *27 father was a Portuguese; he passed as a white man,” etc. If there had been anything more in his favor, would he not have then discovered it? See complainant’s exhibits, pages 12 and 13. In this we have the clue to the muddy and indistinct recollections of Dailey, Carter and. Lewis, on which they have grounded their affidavits. It is altogether more than probable that this was the case of which they still had a dim recollection when they testified for complainant’s benefit. Another consideration is worthy the attention of the Court. The affidavits were in the hands of complainant since' the last of June or 1st of July, 1861. His bill is not filed until the April term, 1862, of Plouston Superior Court. The argument on the demurrer was heard in Chambers in November, 1862, at which time counsel amended his bill. In this amended bill they state that complainant had been very diligent to ascertain or elicit testimony concerning the status of said Nunez, etc., but he nowhere alleges that he has taken any steps in Burke county to have the pretended burnt or destroyed record set up, etc. Why did he not do so ? Is it not evident to the Court that if he had placed much confidence in these affidavits of Dailey, Carter and Lewis, that he would have dune so ? How is the pretended fact which he wished to set up by these affidavits to avail him uuless he does establish the lost record, which he would have the Court believe once existed. To my mind, the conclusion is irresistible that it is all a mere pretext to revivify the defunct case — -to once more get it reinstated on the docket of the Court below, and thus delay, for an indefinite period, the final result of the case, and this, too, when he has already had four trials at law and two hearings in this Court, besides the one on which his ease was dismissed, on account of his negligence and that of his counsel. But this evidence, if it were unexceptionable in every other respect, is only cumulative; because it only seeks to make a defense stronger which they have already made. Indeed, it was on the point to which the testimony relates that the main issue was made below.
I need not cite authorities to support the position that newly discovered evidence, which is cumulative, furnishes no ground for relief against a judgment at law. All evidence is cumulative which merely multiplies witnesses to any one or more of *28 those facts before investigated, or only adds other circumstances of the same general character: 3 Graham and W., 1048; 20 Com. Rep., Waller vs. Graves, 303.
The evidence brought up here by the complainant does this only, and nothing more, for it fails to establish the fact that there was a legal judgment on the issue of Nunez’s status. There is, it is true, an occasional exception to this rule, as when by admitting cumulative testimony, what was before mysterious and doubtful, becomes plain and certain; so that, if received, the most obvious justice — and if rejected, the most palpable injustice — will be done. Courts do not hesitate to adopt the former alternative, or where a case with all the light that can be thrown upon it is still obscure, and subsequent developments entirely remove that obscurity and show that injustice has been done by the verdict, it is but common justice that the aggrieved party should have a new trial: 3 Graham and Waterman, 1064. But this case presents no such claims upon the consideration of this Court. Like a bill of review, a bill for a new trial should not be entertained for a discovery of evidence, unless the new evidence be either of a certain and permanent character, as a writing, or relevant to a point which was not put in issue for want of proof to sustain it. This is the general rule. We know of no case in which a new trial has been granted or sanctioned on the isolated ground of a disco very of witnesses to a fact involved in the issue at law and tried. That this ought never to be done is proved not only by the unjust and mischievous consequences of a different practice, but by an unbroken series of decisions : 3 Graham and Waterman, 1540 and 1541. Again, these affidavits go to impeach the testimony in the former trial, because if they lead to anything at all, it is to prove that which, if obtained, would be in direct conflict with the records of Burke Inferior Court, and for this reason the Court will refuse a new trial: 10 Georgia, 511, Berry vs. The State. Nor is the evidence (that is, what these witnesses would themselves prove,) so material as that it would probably produce a different verdict if the new trial were granted : Ibid. As to the other grounds in complainant’s bill, if, indeed, his counsel are serious in urging them, though I suppose they were put in as mere *29 “ make shifts,” they come too late, because they knew of them during the pendency of the trover trial, and nowhere allege that they have recently come to the knowledge of them. If they were available at all, they were so pending the trial at law. For Courts of equity will not interpose for the relief of parties against verdicts and judgments at law if the defendant below neglect to bring his bill for discovery in aid of his defense at law: 1 Graham and Waterman, 571, and cases there cited; William vs. Lee, 3 Ark., 223.
We will merely add that it is strange that no one can be found to testify more satisfactorily about tin’s issue, alleged to have been tried in Burke Superior Court. My brother Jenkins, though by no means an old man, still his professional recollection reaches back, I apprehend, to 1840, and perhaps beyond that; he is intimately acquainted with the population of Burke county, and for upwards of twenty years has borne an important part in its judicial proceedings: does he recollect of any such question ever having been tried and decided by the Courts of that county ? So of ex-Governor Crawford, and many other attorneys, some of whom are yet alive, and others were living until within a late period. Would the testimony of these three witnesses be sufficient to supply the burnt records? We apprehend not, and that test is decisive of the question.
Upon a calm review of the- whole case, then, we feel constrained to affirm the judgment of the Court below.
Let the judgment be affirmed.